# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY JONES, | ) 1:06cv01693 OWW BAK (DLB) |
| | ) |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION |
| | ) REGARDING PLAINTIFF'S |
| v. | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Anthony Jones ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendation to the District Court.[1]

---

[1] Due to the resignation of Magistrate Judge Theresa A. Goldner, this case was temporarily reassigned to the Honorable Dennis L. Beck on April 6, 2009.

1

## FACTS AND PRIOR PROCEEDINGS[2]

2   Plaintiff filed his applications on August 11, 2003, alleging disability since May 17, 1999,

3   due to back pain.  AR 57-59.  After being denied both initially and upon reconsideration, Plaintiff

4   requested a hearing before an Administrative Law Judge ("ALJ").  AR 32-32, 40-44, 45.  On

5   February 18, 2005, ALJ Thompson held a hearing.  AR 270-291.  He denied benefits on May 27,

6   2005.  AR 21-29.  On September 12, 2006, the Appeals Council denied review.  AR 5-9.

7   <u>Hearing Testimony</u>

8   _____ALJ Thompson held a hearing on February 18, 2005, in Stockton, California.  Plaintiff

9   appeared with his attorney, Gina Fazio.  Vocational expert ("VE") George Meyers also appeared

10   and testified.  AR 270.

11   _____Plaintiff testified that he was 49 years old at the time of the hearing.  He finished the

12   eleventh grade and can read and write.  Plaintiff was 5'3" tall and weighed 150 pounds.  AR 275.

13   He was single and lived alone.  AR 276.

14   Plaintiff last worked in early 2000 as a production worker.  He had previously injured his

15   back on May 17, 1999.  AR 276-277.  He stopped working after the injury and sought treatment.

16   AR 281.

17   Plaintiff believed that he could no longer work because of back pain.  AR 282.  He

18   currently sees his doctor once a month.  Plaintiff had four epidural shots since his injury, which

19   helped a little with the pain.  He was currently taking pain medication, including Hydrocodone,

20   which helped, and Ibuprofen.  AR 282.  Plaintiff explained that he has constant pain in his low

21   back that shoots down his right leg and up into his neck.  His left leg is also affected some days.

22   AR 283.  Two of his doctors have recommended surgery, but Plaintiff has refused because he is

23   terrified of needles.  AR 284.  Plaintiff has tried physical therapy, but it did not work.  AR 284.

24   Plaintiff tries to wash dishes and make his bed.  He relies on his cousin to sweep and

25   vacuum, though Plaintiff sometimes prepares meals.  AR 285.  His cousin goes with him when he

26   grocery shops.  Plaintiff thought he could walk a block or a block and a half.  AR 286.  He

27

28   _____

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

thought he could stand for 30 minutes and explained that the time he can sit depends on his pain. AR 288.  He could lift a bag of groceries as well as a gallon of milk.  AR 298.  Plaintiff is also able to take care of his personal hygiene, though it is hard to get in and out of the shower and put his clothes on.  AR 286.  To pass the time, Plaintiff watches television while lying on the couch. AR 287.  He lays down most of the day.  AR 289.  He tried to take computer repair training classes, but his back hurt too much.  AR 290.

Plaintiff testified that he is not receiving treatment for any other ailment.  He explained, though, that he doesn't comprehend well and was in special education classes.  AR 287.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience.  This person could lift 20 pounds occasionally, 10 pounds frequently, could stand and walk, in combination, for at least six hours a day and could sit for the remainder of the work day.  This person could occasionally bend, stoop, twist, squat, kneel and crawl, but could not climb ladders of scaffolds.  This person should not work around heights and had to avoid hazardous machinery.  AR 291.  The VE testified that this person could perform the positions of assembler, production inspector and packaging fulling operator.  AR 291.

Plaintiff's attorney asked the VE if the result would change if this person could neither sit nor stand for longer than 30 minutes without the availability of a 5 minute break.  The VE testified that there would be no positions available.  AR 292.

The ALJ then asked the VE to assume that this person needed to change positions from sitting to standing every 45-60 minutes.  The VE testified that the assembly position would be eroded by about 60 percent, the production inspection position by 60 percent, and the packaging and filling position by 80 percent.  AR 293.

Medical Evidence

Plaintiff began treatment with Gerald P. Keane, M.D., in September 1999.  On examination, he had guarded lumbar motion with some mild, local lumbar spasm.  His neurologic examination was normal.  Dr. Keane diagnosed lumbar disc protrusion at L5/S1 with persistent, chronic low back pain.  AR 207-208.

On December 9, 1999, Dr. Keane completed a final workers' compensation report. He explained that Plaintiff had an epidural block on November 1, 1999, but the pain had returned. Dr. Keane opined that Plaintiff could not lift more than 15 pounds and could not perform repetitive bending, lifting and twisting. If he sat, he would need to change positions every hour on an as-needed basis. AR 199-200.

In January 2000, Dr. Keane noted significant guarding of lumbar motion and obvious lumbar spasm. He did not change his December 9, 1999, restrictions. AR 198.

In February 2000, Plaintiff reported that he was going back to modified employment at his prior job, though his pain was getting difficult to manage. His range of motion was guarded and he had generalized spasms. Dr. Keane recommended that he change positions from both sitting and standing every 20 minutes, in addition to the prior limitations. AR 197.

In May 2000, Plaintiff told Dr. Keane that he tried to work, but only lasted for two hours. On examination, his lumbar motion was restricted in all directions with some mild generalized spasms. Dr. Keane determined that Plaintiff could no longer perform his old job and should initiate the rehabilitation process. AR 193.

Plaintiff saw Dr. Keane on June 21, 2000, and reported that although he had been through therapy, it was not helping. The anti-inflammatory medication was not helping, either. Plaintiff's neurologic examination was stable. Dr. Keane started Plaintiff on Ultram and recommended a nerve root block. AR 191.

On August 10, 2000, Dr. Keane performed an epidural block. AR 188.

Plaintiff returned to Dr. Keane on March 12, 2001. He complained of persistent back pain with any repetitive activity, bending or lifting. On examination, he was guarded with lumbar motion and there were some mild spasms. There were no motor sensory deficits and straight leg raising was negative. Dr. Keane diagnosed lumbar disc protrusion with chronic low back pain and noted that Plaintiff was neurologically stable. Plaintiff did not appear to be a candidate for anything invasive and Dr. Keane instructed Plaintiff to follow-up as needed. AR 186.

On June 21, 2001, Plaintiff returned to Dr. Keane and reported sharp pain in the left side of his low back. He was not taking any medications. Plaintiff had not started vocational

rehabilitation because he was trying to get long-term disability benefits.  On examination, his lumbar motion was guarded and there was generalized tenderness across the left low back.  AR 184.

In January 2002, Plaintiff told Dr. Keane that his low back and right leg pain were getting worse.  Although it was authorized, Plaintiff was not able to get to the gym program.  He was not taking any medications.  Straight leg raising was positive on the right and Plaintiff was guarded with lumbar motion.  Plaintiff explained that he was anxious about any kind of invasive approach, but was worried that he was getting worse.  AR 182.

A lumbar MRI performed on February 28, 2002, revealed a small L5/S1 disc protrusion without evidence of a neural element compromise and degenerative facet changes at L5/S1 bilaterally.  AR 133.  There was no significant change from the August 1999 MRI.  AR 179.

In March 2002, Plaintiff continued to complain of persistent back pain.  Dr. Keane told Plaintiff that there was no significant change in his MRI and told him that he had gone through all conservative treatment.  Dr. Keane noted that his neurological status appears to be stable, but Plaintiff remained symptomatically persistent.  If Plaintiff wished to look at surgical options, Dr. Keane offered to make a referral.  AR 180.

In July 2002, Plaintiff told Dr. Keane that he had started vocational rehabilitation in computers because his prior employer could not accommodate him.  He was guarded with all lumbar motion and had some generalized tenderness across the low back.  Dr. Keane diagnosed L5-S1 disc protrusion with chronic low back pain.  Plaintiff was neurologically stable.  He received a sample of Ultracet, and although Plaintiff asked about Vicodin, Dr. Keane was uncomfortable prescribing a long-term narcotic.  AR 178.

Plaintiff saw Paul Sandhu, M.D., on October 7, 2002, for a Qualified Medical Examination ("QME").  Dr. Sandhu reviewed treatment records from Dr. Boyd and Dr. Keane, as well as a prior QME.  Plaintiff described constant throbbing, shooting, sharp and pressure-like pain.  He rated it as a ten on a ten-point scale and stated that he had been very limited in physical activities for the past month.  Plaintiff reported that epidural steroid injections provided excellent relief that

lasted four to six months, although oral medications and physical therapy did not help much. AR 118-122.

On examination, Plaintiff had a slight antalgic gait with tendency towards minimizing weight bearing on the left lower extremity. Range of motion in his lumbar spine was reduced and straight leg raise was positive on the right, with radiating pain down to the heel. Plaintiff had moderate tenderness bilaterally at L4/L5 and L5/S1 and his sacroiliac joints were minimally tender bilaterally. There was diffuse moderate tenderness in the lumbar paraspinal region. Plaintiff also had minimal to moderate paraspinal muscular tenderness. Plaintiff had decreased motor function in ankle plantar flexion and decreased sensation along the lateral aspect of the calf. AR 124-128.

Dr. Sandhu diagnosed lumbosacral radiculopathy in a right greater than left L5/S1 type distribution, apparent degenerative disc disease, lumbar facet joint arthropathy, L4/L5 and L5/S1 levels bilaterally, mild bilateral SI joint arthropathy and myofascial pain syndrome, lumbar and cervical. Dr. Sandhu opined that Plaintiff's condition had worsened since he was first declared permanent and stationary in 2000. Plaintiff could not lift more than 15 pounds, could not sit or stand for more than 30 minutes at a time without the availability of five minute stretch breaks, and could not squat, crawl, kneel, crouch or stoop. Along with medication, further epidural steroid injections, and physical therapy, Dr. Sandhu noted that Plaintiff may need a referral to a spine surgeon to obtain an option as to Plaintiff's candidacy for surgery. AR 128-130.

On October 8, 2002, Plaintiff underwent bilateral motor and nerve conduction studies. The results were essentially normal. Dr. Sandu explained, however, that Plaintiff's clinical status, prior efficacy of epidural steroid injections, and his diagnostic studies, suggest the presence of lumbosacral radiculopathy and did not change Plaintiff's need for treatment. AR 115-116.

Plaintiff returned to Dr. Keane on November 18, 2002, and stated that the pain in his back, neck and legs pain was increasing. He rated his pain as a ten out of ten. Plaintiff left the vocational rehabilitation program because he could not manage the pain. Dr. Keane spoke with Plaintiff about his options and noted that he "honestly [does] not have anything else to suggest." Although he had some disc protrusion, Dr. Keane could not recommend that his pain be treated "by more invasive options" and noted that the extent of his pain "is beyond the extent of the

objective findings." Dr. Keane believed that Plaintiff had a significant low back problem but did not see any other good choices. Dr. Keane did not believe that surgery had much to offer and suggested that he may be best served by a chronic pain management specialist. Given the similarity of his scans, Dr. Keane did not see any evidence of further disability and could not objectively verify such a claim. AR 175.

_____On February 14, 2003, Dr. Sandhu clarified his QME and explained that Plaintiff could not lift more than 15 pounds, and could not squat, crawl, kneel, crouch or stoop. Plaintiff could sit and stand without limitation during an eight hour day, but could not sit or stand for more than 30 minutes at a time without a five minute stretch break. AR 112-113.

_____On March 7, 2004, Plaintiff saw Liana Turkot, M.D., for a consultive examination. Plaintiff complained of low back and neck pain, and difficulty sleeping secondary to the pain. Plaintiff reported that he could do his own cooking, mopping, vacuuming, sweeping, washing dishes, laundry and grocery shopping. He was taking Tylenol. On examination, Plaintiff did not have trouble walking down the hallway, sitting in a chair, getting on the examination table or removing his shoes. Coordination, station and gait were normal. Range of motion in the neck and lumbar spine was normal. Strength, muscle tone and bulk were normal. Sensation was intact and reflexes were normal. AR 133-136.

Dr. Turkot diagnosed low back pain with a history of low back injury and a history of neck pain. She opined that Plaintiff could stand and/or walk up to six hours in an eight hour day and could sit without restriction. She recommended periodic positional changes secondary to Plaintiff's low back pain. Plaintiff could lift 10 pounds frequently, 20 pounds occasionally. AR 136-137.

On March 19, 2004, State Agency physician David Pong, M.D., completed a Physical Residual Functional Capacity form and opined that Plaintiff could lift 10 pounds frequently, 20 pounds occasionally, stand and/or walk for about six hours and sit for about six hours. AR 138-145.

On May 6, 2004, Plaintiff saw Jeff Jones, M.D., at the Stockton Pain Medical Center. On examination, gait was normal and he could stand on his heels and toes. Extension at the lumbar

7

spine increased his pain somewhat.  Sensation was intact, straight leg raising was negative and he had no marked tenderness.  Dr. Jones diagnosed lumbar spondylosis at L5/S1, rule out lumbar facet syndrome.  AR 150-151.

Dr. Jones performed an epidural steroid injection on June 22, 2004.  AR 148.

Plaintiff returned to Dr. Jones on July 13, 2004, and reported significant long term improvement from the June epidural steroid injection.  AR 147.  Plaintiff was started on Ibuprofen 800 mg and Hydrocodone.  AR 147.

On August 10, 2004, Plaintiff saw Dr. Jones and reported that his pain was returning, though not as severe as before the June injection.  He complained of mild low back pain and weakness in both legs.  On examination, his gait was stable with no limp.  Reflexes were normal and sensation was intact to light touch over the lower extremities.  Dr. Jones diagnosed lumbar spondylosis at L5/S1 and suggested that Plaintiff return for an injection when his pain can no longer be controlled by medication.  Dr. Jones noted that his back pain was stable.  AR 174.

On September 9, 2004, Anthony Dipsia, M.D., completed a Physical Functional Capacity form and opined that Plaintiff could lift 10 pounds frequently, 20 pounds occasionally, stand and/or walk for about six hours, with normal breaks, and sit for about six hours, with normal breaks.  AR 152-159.

Plaintiff returned to Dr. Jones on September 14, 2004.  He complained of low back pain and bilateral leg weakness, greater in the left.  Plaintiff stated that the pain was now interrupting his daily activities and his sleep.  He was taking three Motrin 800 mg and three Hydrocodone per day.  On examination, his gait was stable with no obvious limp.  Reflexes were normal and sensation was intact.  Dr. Jones diagnosed lumbar spondylosis and recommended a lumbar epidural steroid injection.  AR 172.  Dr. Jones indicated that Plaintiff was temporarily totally disabled until October 12, 2004.

Plaintiff saw Dr. Jones again on October 12, 2004.  He complained of increased stress because workers' compensation had stopped his pay.  He also complained of low back pain, bilateral leg weakness, and occasional numbness and tingling in his legs.  His pain now interrupted all activities of daily living, including sleep.  During examination, Plaintiff was obviously sad and

depressed.  Dr. Jones diagnosed lumbar spondylosis and depression and gave Plaintiff samples of Lexapro.  AR 239.

On November 9, 2004, Plaintiff saw Dr. Jones and reported low back pain, weakness in his right leg and stress related to his injury.  He was having problems with daily activities and sleeping because of the pain.  Plaintiff reported that Lexapro was helping him deal with the depression and stress.  On examination, he appeared somewhat sad and depressed.  His gait was stable and his examination was unchanged.  He was prescribed Lexapro, Hydrocodone and Ibuprofen 800 mg.  AR 211.

Plaintiff returned to Dr. Jones in December 2004.  The October injection did not provide long-term relief.  On examination, Plaintiff had pain with extension and rotation at the lumbar spine.  His MRI showed degenerative facet changes at L5-S1 and a small L5-S1 disc protrusion without evidence of stenosis or neuroforaminal compromise.  Dr. Jones believed that facet disease was the likely cause of his pain and recommended a set of medial branch blocks as soon as possible.  AR 212.

On February 10, 2005, Dr. Jones recommended surgical evaluation if facet disease was not the cause of the pain.  AR 213.

*Evidence Submitted to Appeals Council*

On March 10, 2005, Dr. Jones examined Plaintiff and noted that the medial branch blocks did not provide relief.  His examination was unchanged.  Dr. Jones diagnosed degenerative disc disease now that his facets have been ruled out.  Dr. Jones offered Plaintiff a surgical evaluation, but Plaintiff declined.  AR 231.

Plaintiff saw Dr. Jones on May 31, 2005.  He complained of low back pain with occasional right leg pain.  Plaintiff was taking Hydrocodone, Ibuprofen 800 mg and Gabitril.  Plaintiff's gait was normal and reflexes and sensation were intact.  Dr. Jones refilled Plaintiff's medication and increased the dose of Gabitril.  AR 228.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairment of degenerative disc disease of the lumbar spine.  AR 25.  Despite this, the ALJ found that Plaintiff retained the residual

functional capacity ("RFC") to lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk up to six hours and sit up to six hours.  Plaintiff could occasionally bend, stoop, squat, kneel and crawl, but could not climb except for ramps and stairs.  AR 27.  Plaintiff could not work at heights or around dangerous, moving machinery.  AR 27.  Based on the testimony of the VE, the ALJ determined that Plaintiff could perform a significant number of light jobs.  AR 27-28.

### SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

### REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists

1  in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

2  burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

3  1990).

4         In an effort to achieve uniformity of decisions, the Commissioner has promulgated

5  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

6  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Here, the ALJ determined that Plaintiff (1)

7  had not engaged in substantial gainful activity since the alleged onset of disability;(2) has an

8  impairment or a combination of impairments that is considered "severe" (degenerative disc disease

9  of the lumbar spine) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3)

10  does not have an impairment or combination of impairments which meets or equals one of the

11  impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past

12  relevant work; and (5) retains the RFC to perform a significant number of jobs in the national

13  economy.  AR 25-28.

14         Plaintiff contends that the ALJ erred in his RFC finding by failing to properly address the

15  medical source opinions; and did not properly evaluate Plaintiff's testimony.

16                                   **DISCUSSION**

17  A.     ALJ's RFC Finding

18         Plaintiff first argues that the ALJ's RFC for light work was not supported by the evidence.

19  Plaintiff contends that the ALJ should have adopted Dr. Sandhu and Dr. Keane's opinions, which

20  would have placed him in a "semi-sedentary" RFC and classified him as disabled under the

21  Medical Vocational Guidelines.

22         RFC is an assessment of an individual's ability to do sustained work-related physical and

23  mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

24  week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only functional

25  limitations and restrictions which result from an individual's medically determinable impairment or

26  combination of impairments.  SSR 96-8p.  "In determining a claimant's RFC, an ALJ must

27  consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and

28  'the effects of symptoms, including pain, that are reasonably attributed to a medically

1   determinable impairment.' " *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th

2   Cir.2006).

3        The ALJ found that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently,

4   could stand and/or walk up to six hours and could sit for up to six hours.  Plaintiff could

5   occasionally bend, stoop, squat, kneel and crawl.  In reaching his RFC finding, the ALJ states that

6   he adopted portions of two examining physicians' opinions, Dr. Turkot and Dr. Sandhu,[3] and the

7   opinion of the State Agency physician, Dr. Dipsia.  AR 27.

8        Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

9   who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

10  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

11  physicians).  As a general rule, more weight should be given to the opinion of a treating source

12  than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

13  647 (9th Cir.1987).  At least where the treating doctor's opinion is not contradicted by another

14  doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

15  1391, 1396 (9th Cir.1991).  Even if the treating doctor's opinion is contradicted by another

16  doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

17  reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

18  F.2d 499, 502 (9th Cir.1983).

19       The opinion of an examining physician is, in turn, entitled to greater weight than the

20  opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990);

21  *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating

22  physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

23  uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506. And like the opinion

24  of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

25  can only be rejected for specific and legitimate reasons that are supported by substantial evidence

26  in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

27

28        ─────────────────
          [3] It is unclear what portion of Dr. Sandhu's opinion the ALJ adopted, as it appears he rejected his report
          in its entirety.

                                                    12

1    Therefore, in adopting the examining and non-examining physicians' opinions over that of

2    Dr. Keane, the ALJ was required to set forth clear and convincing reasons for doing so.  Perhaps

3    the most compelling reason cited by the ALJ was Dr. Keane's own finding that Plaintiff's

4    complaints of pain were "beyond the extent of the objective findings." AR 27, 175.  Indeed,

5    during that same visit in November 2002, Dr. Keane specifically stated that because of the

6    similarity in MRI scans, he did not see any evidence of further disability and could not objectively

7    verify such a claim.  AR 175.  *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (lack of

8    supporting clinical findings is a valid reason for rejecting a treating physician's opinion).  These

9    statements certainly call into question Dr. Keane's restrictive opinion.

10   Insofar as Plaintiff cites Dr. Keane's objective findings of limited range of motion and

11   spasm, as well as his offer of a surgical referral, these findings do not negate the ALJ's finding

12   that Plaintiff could perform light work.  Plaintiff will not prevail simply because there is evidence

13   supporting his position.  Richardson v. Perales, 402 U.S. at 399; Sample v. Schweiker, 694 F.2d

14   639, 642 (9th Cir. 1982).  Moreover, even though Dr. Keane offered to refer Plaintiff to a

15   surgeon, it appears that he did so to accommodate Plaintiff.  During the same meeting with

16   Plaintiff, Dr. Keane stated that he couldn't recommend more invasive procedures and that he

17   didn't believe surgery had much to offer. AR 175.  Dr. Keane believed, and the ALJ agreed, that

18   Plaintiff had functional limitations arising from his back impairment.  In this regard, the ALJ

19   restricted Plaintiff to light work.

20   As to the ALJ's acceptance of Dr. Turkot's functional limitations, Plaintiff contends that

21   Dr. Turkot did not review much of the evidence and did not make any diagnosis.  In adopting Dr.

22   Turkot's opinion, the ALJ noted that Plaintiff told Dr. Turkot that he was able to do most

23   household chores, including "cooking, mopping, vacuuming, sweeping, dishes, laundry and

24   grocery shopping." AR 26, 133-136.  He also noted Dr. Turkot's benign examination findings.

25   Although Plaintiff complained of low back and neck pain, he was able to walk down the hallway,

26   sit in a chair, get on the examination table and remove his shoes.  His coordination, station and

27   gait were normal, as was range of motion in the neck and lumbar spine.  Strength, muscle tone

28   and bulk and reflexes were normal and sensation was intact.  AR 133-136.  Given Plaintiff's

1    report of activities and normal examination findings, Dr. Turkot's opinion constitutes substantial

2    evidence.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

3         Plaintiff further suggests that the ALJ improperly rejected Dr. Sandhu's opinion.  Again,

4    however, the fact that evidence exists to support Plaintiff's position does not render the ALJ's

5    findings invalid.  The ALJ discussed Dr. Sandhu's opinion but rejected his limitations to the extent

6    they conflicted with the RFC.  AR 25-26.  Although the ALJ did not specifically explain why he

7    rejected Dr. Sandhu's opinion, his opinion suggests that he did so because, as with most of

8    Plaintiff's complaints, the objective findings did not match the restrictive limitations.  The ALJ

9    need not recite the incantation "I reject the treating physician's opinions because ..." so long as the

10   record reveals specific, legitimate inferences that may be drawn from the ALJ's opinion justifying

11   the decision not to adopt the treating physician's opinion.  *Magallanes,* 881 F.2d at 755.

12        As to the rejection of Nurse Meade's opinion that Plaintiff is "unable to work at this time,"

13   it is unclear to the Court that Nurse Meade was the author of the report cited to by the ALJ.  AR

14   26-27, 213.  In any event, a statement by a medical source indicating a claimant is "disabled" does

15   not mean that the Secretary will concur, absent review of medical findings and other evidence.  20

16   C.F.R. 416.927(e).  "Conclusory opinions by medical experts regarding the ultimate question of

17   disability are not binding on the ALJ."  *Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985).

18        Finally, although Plaintiff disagrees, the ALJ was entitled to rely on the State Agency

19   physician's opinion as part of his RFC finding.  When combined with other consistent evidence in

20   the record, as here, a non-examining physician's opinion can constitute substantive evidence.  *See*

21   *eg.*, *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990).

22        To the extent that Plaintiff suggests that his depression should have been found a severe

23   impairment and/or discussed in the RFC finding, there is no suggestion in the record that Plaintiff

24   has any limitations resulting from depression.  Contrary to Plaintiff's argument, the ALJ does not

25   have a duty to develop the record where the evidence is sufficient to allow for proper evaluation.

26   *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001).

27        Accordingly, the Court finds that the ALJ's treatment of the medical evidence and the

28   ultimate RFC finding was supported by substantial evidence and free of legal error.

14

1   B.   The ALJ's Credibility Finding

2        Plaintiff next contends that the ALJ did not fully and fairly review his testimony.

3        In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

4   pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's

5   subjective complaints:

6            An ALJ is not "required to believe every allegation of disabling pain" or other
             non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).
7            However, to discredit a claimant's testimony when a medical impairment has been
             established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*,
8            169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why
             the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find
9            "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the
             claimant's testimony must be clear and convincing." *Id.*

10
11           Social Security Administration rulings specify the proper bases for rejection of a
             claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be
12           supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at
             57860 ("Although Social Security Rulings do not have the same force and effect as the
13           statute or regulations, they are binding on all components of the Social Security
             Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see*
14           *Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at
             step three of the disability determination was contrary to agency regulations and rulings
15           and therefore warranted remand). Factors that an ALJ may consider in weighing a
             claimant's credibility include reputation for truthfulness, inconsistencies in testimony or
16           between testimony and conduct, daily activities, and "unexplained, or inadequately
             explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885
17           F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

18        In his decision, the ALJ first noted that the objective evidence did not support Plaintiff's

19   "high level of disabling pain." AR 27. As discussed above and noted by the ALJ, even Plaintiff's

20   treating physician found his complaints to be out of proportion with the objective evidence.

21   Although the ALJ cannot rely on the lack of objective evidence as the sole factor in discrediting a

22   claimant, he can consider it as part of the analysis. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

23   1996). Plaintiff cites to Dr. Keane's notation of objective factors in his December 1999 report,

24   such as the MRI findings, yet the ALJ accepted that there were certain objective findings and

25   limited Plaintiff accordingly. The existence of evidence to support Plaintiff's position does not, by

26   itself, render the ALJ's determination improper. The Court must uphold the ALJ's decision

27   where the evidence is susceptible to more than one rational interpretation. *Magallanes v. Bowen*,

28   881 F.2d 747, 750 (9th Cir. 1989).

1    The ALJ next commented on the lack of medical treatment, explaining that Plaintiff had

2    not received the amount of treatment since 1999 that would be expected of someone in disabling

3    pain.  AR 27.  The Court questions whether an ALJ should make such a judgment call, but

4    recognizes that an ALJ can make logical inferences flowing from the record.  *See Sample v.*

5    *Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  While Plaintiff's more recently received treatment

6    once a month, his early medical treatment was inconsistent, with numerous gaps between visits.

7    Similarly, the ALJ also cited the lack of significant treatment in 2003 and noted that the

8    gap is unexplained.  AR 27.  Indeed, Plaintiff did not receive any treatment in 2003, and the ALJ

9    was entitled to rely on this to question his credibility.

10    Plaintiff disagrees with the ALJ's characterization of the medical record by arguing that

11    his treating sources consistently maintained that "he had tried everything possible conservatively,

12    and surgery was offered at least once. . ."  Opening Brief, at 10.  Plaintiff's characterization,

13    however, does not render the ALJ's interpretation incorrect.  *Magallanes*, at 750 (the Court must

14    uphold the ALJ's decision where the evidence is susceptible to more than one rational

15    interpretation).

16    Insofar as Plaintiff cites the recommendation of surgery, the ALJ correctly noted that

17    when Dr. Keane cited surgery as a possibility, he also stated that he did not believe that surgery

18    had much to offer.  AR 175.  Indeed, the context of Dr. Keane's discussion during Plaintiff's last

19    visit suggests that Dr. Keane questioned Plaintiff's subjective allegations.  AR 175.  Plaintiff also

20    states that Dr. Jones "offered" surgery, but the record shows that Dr. Jones offered a surgical

21    evaluation, which Plaintiff rejected.  AR 231.

22    Next, the ALJ explained that although Plaintiff alleged depression, he did not seek

23    significant treatment and was not referred for psychiatric care.  AR 27.  The record shows that

24    Dr. Jones diagnosed depression in October and November 2004, and treated Plaintiff with

25    Lexapro.  In November 2004, Plaintiff reported that the medication was helping him deal with his

26    depression and stress.  AR 211, 239.  Although Plaintiff continued to see Dr. Jones, there was no

27    further diagnosis of depression.  In May 2005, Plaintiff was taking Gabitril, an anti-seizure

28

medication, though the reason for the medication is unclear.[4]  AR 228.  In any event, the record suggests that Plaintiff's depression was controlled and Dr. Jones did not refer Plaintiff for specialized mental health treatment.  Although Plaintiff suggests that the ALJ had a duty to send Plaintiff for a consultive examination, the evidence of Plaintiff's depression was adequate to render a decision.  _Thomas v. Barnhart_, 278 F.3d 947, 958 (9th Cir. 2002) (requirement to recontact treating source "triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability.").

Finally, Plaintiff argues that the ALJ did not sufficiently review the evidence because his reporting of the "two hearings' representations" was "less than a page." Opening Brief, at 11. Plaintiff's exact argument is unclear.  Nonetheless, the Court does not review the ALJ's decision on the basis of how much space he devotes to the review of evidence.  There is no indication here that the ALJ's review was insufficient.

Therefore, the Court finds that the ALJ's credibility finding was sufficient to allow the Court to determine that the ALJ did not arbitrarily reject Plaintiff's testimony.  The analysis was supported by substantial evidence and was free of legal error.

## **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Anthony Jones.

These findings and recommendations will be submitted to the Honorable Oliver W. Wanger pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

---

[4] _Physicians' Desk Reference,_ 984 (61st ed. 2007).

and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   November 10, 2009**                        _____/s/ **Dennis L. Beck**
                                                                UNITED STATES MAGISTRATE JUDGE